**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER DENYING DEFENDANT'S** |
| | ) | **MOTION TO DISMISS FOR FAILURE** |
| vs. | ) | **TO PRESERVE EVIDENCE** |
| | ) | |
| Ivanna Red Bow, | ) | Case No. 1:11-cr-001 |
| | ) | |
| Defendant. | ) | |

Before the Court is Defendant Ivanna Red Bow's motion to dismiss filed on February 29, 2012. See Docket No. 45.

**I.    BACKGROUND**

At approximately 4:32 a.m. on December 30, 2010 units from the Bureau of Indian Affairs (BIA) Police Department, Standing Rock Agency, were dispatched to 878 Blue Jay Street, Cannonball, North Dakota, for a 911 call for medical assistance involving a stabbing. The caller was identified as Carol White Eagle, Loren Uses Arrow's biological mother.

While Carol White Eagle was calling 911, her husband, Lyle Uses Arrow, and her daughter, Arianna Uses Arrow, followed what appeared to be a blood trail in the snow leading to Ivanna Red Bow's residence. Red Bow was Loren Uses Arrow's girlfriend and they shared the residence. When Lyle Uses Arrow and Arianna Uses Arrow approached Red Bow's residence they observed Red Bow in the dining room on the phone. Arianna Uses Arrow observed blood on Red Bow's hands. She then knocked Red Bow to the floor and began to punch and hit her.

Officer Stacy LaRocque was the first law enforcement officer to arrive on scene and discovered Loren Uses Arrow lying on the floor inside the back door of his parents' residence, with

blood pooled underneath him. Loren Uses Arrow's brother, Milan Uses Arrow, was present and indicated to Officer LaRocque that Loren had been stabbed and was not breathing. Officer LaRocque quickly assessed that Loren's pupils were dilated and it appeared he had no pulse. Officer LaRocque began to give Loren Uses Arrow CPR.

As Officer LaRocque was providing emergency medical assistance to Loren Uses Arrow, family members told the officer that Loren Uses Arrow lived with Ivanna Red Bow in a house a short distance away and that whatever happened to Loren happened at the Red Bow residence. Officer LaRocque continued to provided first responder medical assistance to Loren Uses Arrow, but did convey the information he received to Sergeant Garry Weasel.

Sergeant Weasel, who had arrived on scene less than ten minutes after Officer LaRocque, proceeded to the Red Bow residence. He immediately observed what appeared to be blood on the porch and the front door. The door was slightly ajar. Sergeant Weasel knocked and after a moment the door was fully opened by Ivanna Red Bow. As Red Bow opened the door Sergeant Weasel observed blood all over the floor of the residence. Sergeant Weasel asked Red Bow what happened and Red Bow responded that Loren Uses Arrow had tried to stab Red Bow and then he ran outside.

Sergeant Weasel detained Red Bow and began to clear the residence. In clearing the residence Sergeant Weasel discovered Red Bow's two children lying asleep in one of the back bedrooms, with an adult male lying asleep beside them. Sergeant Weasel identified the adult male as Clayton Ayutapi. Sergeant Weasel noticed that Ayutapi had what appeared to be blood on his hands and clothes. Ayutapi was then detained. As Sergeant Weasel cleared the remainder of the residence, he observed and photographed what appeared to be blood in the living room area. He also identified and seized what appeared to be a bloody knife in the kitchen sink.

While securing the residence Sergeant Weasel heard from Sergeant Garry Sandland that off-duty Officer Thomas Delong reported that Red Bow called and told him that she had just stabbed her boyfriend, Loren Uses Arrow. Officer Delong had previously been in a relationship with Red Bow and had a child in common with her.

Officer Raymond Webb arrived on scene and took Ivanna Red Bow and Clayton Ayutapi into custody. Red Bow was taken into custody for violating the condition of her Standing Rock tribal court probation prohibiting alcohol consumption. Ayutapi was placed under arrest for disorderly conduct. Officer Webb transported both Red Bow and Ayutapi to the Fort Yates Police Station where they were processed by the Standing Rock Detention Center personnel.

During processing, detention personnel took possession of Red Bow's and Ayutapi's clothing and an inventory of their clothing was made. The records show Ayutapi was wearing a green jacket, white t-shirt with what appeared to be blood stains, denim blue jeans with blood stains, black and white shoes with blood stains, and black and grey socks. Photographs also show what appears to be blood on Ayutapi's hands. See Defendant's Exhibit No. 2. Red Bow was wearing a black t-shirt, denim blue jeans, and black shoes. The record does not indicate blood on any of Red Bow's clothing.

After booking, law enforcement officers interviewed both Red Bow and Ayutapi at the Fort Yates Police Station. At approximately 2:30 p.m. on December 20, 2010, Special Agents Jacob O'Connell, Federal Bureau of Investigation ("FBI"), and David Lawrence, BIA, interviewed Ayutapi. During the interview, Ayutapi stated that he consumed alcohol to the point of intoxication, but could not recall any of the events of the previous night and early morning, including how blood got onto his clothing, or how Loren Uses Arrow was stabbed. At approximately 3:55 p.m., Special

3

Agents O'Connell and Lawrence interviewed Red Bow. During the interview, Red Bow provided incriminating statements regarding stabbing Loren Uses Arrow. See Defendant's Exhibit No. 1.

Red Bow made further incriminating statements while in custody at the Standing Rock Detention Center. At approximately 7:30 p.m. on January 2, 2011, Detention Officer Amber Mershon processed an older female into the facility. While the female was being booked, she stated that her nephew Loren Uses Arrow had been murdered. As Officer Mershon walked back through the facility Red Bow asked if what the woman had said was true. Red Bow then stated "I just stabbed him in the chest, not the heart."

On January 3, 2011, Ayutapi was released from custody. Officials at the Standing Rock Detention Center contacted Special Agent O'Connell to determine whether Ayupti's clothing should be retained for evidence or returned to him. Although blood was present on Ayutapi's clothing, Special Agent O'Connell advised the detention personnel to return Ayutapi's clothing to him. Efforts to recover Ayutapi's clothing have been unsuccessful to date.

On January 3, 2011, Ivanna Red Bow was charged in a criminal complaint with unlawfully killing Loren Uses Arrow. See Docket No. 1. On January 12, 2011, she was indicted in federal court on a charge of second degree murder. See Docket No. 15.

On February 29, 2012, Red Bow filed this "Motion to Dismiss Indictment for Failure to Preserve Evidence." See Docket No. 45. Red Bow contends the indictment should be dismissed because the Government failed to preserve the clothing Ayutapi was wearing when he was booked into the Fort Yates police department, which she argues would probably have had an exculpatory value to her. On March 1, 2012, the Government filed a response in opposition to Red Bow's motion. See Docket No. 48. On March 7, 2012, Red Bow filed a reply brief. See Docket No. 50.

4

On March 26, 2012, an evidentiary hearing was held in at the Federal District Court in Bismarck, North Dakota. The trial of this case is set to commence on April 24, 2012.

II.     **LEGAL DISCUSSION**

The Due Process Clause of the Fourteenth Amendment requires that criminal prosecutions comport with "prevailing notions of fundamental fairness." California v. Trombetta, 467 U.S. 479, 485 (1984). As part of this standard, the United States Supreme Court has developed "what might loosely be called the area of constitutionally guaranteed access to evidence." Id. (quoting United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982)). The government may violate the due process guarantee if it fails to preserve evidence in some limited circumstances. Arizona v. Youngblood, 488 U.S. 51 (1988); Trombetta, 467 U.S. 479 (1984).

In Trombetta, the Supreme Court held that a due process violation occurred only when the destroyed evidence had an apparent exculpatory value and the defendant lacked reasonable access to comparably exculpatory evidence. Id. at 488-89. The Supreme Court strongly intimated in Trombetta that bad faith was necessary to prove a due process violation. The Supreme Court later removed all doubt by expressly holding in Youngblood that "unless a defendant can show bad faith on the part of police, failure to preserve potentially useful evidence does not constitute denial of due process of law." Youngblood, 488 U.S. at 58. Accordingly, a defendant may show the government violated their due process rights by failing to preserve evidence only when (1) the government failed to preserve evidence with an apparent exculpatory value for the defendant, (2) comparable exculpatory evidence is not reasonably available to the defendant, and (3) the defendant shows the government acted in bad faith by failing to preserve the apparently exculpatory evidence.

5

The Eighth Circuit Court of Appeals has adopted the standard established by the Supreme Court in Trombetta and Youngblood. See United States v. Webster, 625 F.3d 439, 446-47 (8th Cir. 2010); United States v. Iron Eyes, 367 F.3d 781, 786-87 (8th Cir. 2004); United States v. Scoggins, 992 F.2d 164, 167 (8th Cir. 1993); United States v. Malbrough, 922 F.2d 458, 463 (8th Cir. 1990).

Red Bow asserts that bad faith may be found with a showing of reckless disregard or gross negligence for preserving exculpatory evidence. Red Bow cited ReliaStar Life Ins. Co. v. IOA Re, Inc., 303 F.3d 874 (8th Cir. 2002), in support of this contention. However, the Eighth Circuit in Webster rejected this civil standard of culpability and held that a showing of recklessness was not sufficient to show a due process violation in a criminal case. Webster, 625 F.3d at 447. The Eighth Circuit held as follows:

> As an initial matter, we reject Webster's invitation to impose a lesser standard of culpability on the part of the government in this case. The Supreme Court has "stressed the importance for constitutional purposes of good or bad faith on the part of the Government when the claim is based on loss of evidence attributable to the Government. *Youngblood*, 488 U.S. at 57, 109 S.Ct. 333. In light of *Youngblood*, we have required a showing of bad faith to sustain a due process claim based on the failure to preserve evidence. *Scoggins*, 992 F.2d at 167. Moreover, we have stressed that the burden of demonstrating bad faith on the part of the government resides with the defendant. *Id.*; *Youngblood*, 488 U.S. at 58, 109 S.Ct. 333.

Webster, 625 F.3d at 447.

The Supreme Court in Youngblood explained "[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." Youngblood, 488 U.S. at 56 n.1. Thus, under Youngblood and Webster, and in the context of criminal law and circumstances where the government failed to preserve evidence, bad faith is required rather than negligence, gross negligence, or recklessness.

6

The bad faith standard established by the United States Supreme Court provides relief to defendants in a limited set of circumstances, but does so by design because "whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." Youngblood, 488 U.S. at 57. The Supreme Court also did not believe the due process guarantee should be read as "imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." Id. The Supreme Court concluded "[w]e think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." Id.

At the hearing on March 26, 2012, Special Agent Jacob O'Connell testified that he conducted an interview of Ivanna Red Bow at the Fort Yates Detention Center. Red Bow provided a verbal and written statement admitting that she stabbed Loren Uses Arrow. In addition, Special Agent O'Connell learned that Red Bow made incriminating statements to BIA Officer Thomas Delong and to Detention Officer Amber Meshon. Red Bow did not indicate at any time that Clayton Ayutapi was involved in the stabbing of Loren Uses Arrow. Special Agent O'Connell testified that areas within Red Bow's residence were covered in blood and the relatively small amount of blood found on Ayutapi was consistent with incidental contact with one or more of the bloody areas. Special Agent O'Connell testified the investigation revealed that (1) Ayutapi was outside the residence when the stabbing occurred and (2) there was no evidence Ayutapi was

7

involved in the altercation. Based on Red Bow's multiple incriminating statements, and what appeared to be bloody clothing consistent with incidental contact, Special Agent O'Connell testified that Ayutapi was no longer a person of interest, that is, a suspect in the investigation of Loren Uses Arrow's death. When the detention officer inquired as to whether Ayutapi's clothing should be returned to him on January 3, 2011, Special Agent O'Connell replied that Ayutapi's clothes could be returned to him because the circumstances suggested the clothing was not needed for evidence.

The circumstances of this case are similar to those presented in United States v. Iron Eyes, 367 F.3d 781 (8th Cir. 2004). Iron Eyes was arrested outside a residence in Bismarck, North Dakota. The owner of the residence had called the police ten minutes earlier to report a break-in after he noticed his front had been kicked in. Law enforcement officers found Iron Eyes near the residence in possession of two rifles belonging to the owner. A day after the arrest the homeowner contacted law enforcement to report that he discovered someone had urinated on his bed. The homeowner planned to discard the bed and bedding, but asked whether law enforcement officials needed the bedding for evidence at trial. Law enforcement officials told the owner he could discard the bed and bedding, which the owner did shortly thereafter. Iron Eyes moved to dismiss the indictment and argued that a due process violation occurred because forensic tests of the bed and bedding could have corroborated his version of the events and exonerated him at trial. The Eighth Circuit Court of Appeals held that the district court did not err in denying Iron Eyes motion to dismiss. The Eighth Circuit expressly held that the facts demonstrated the law enforcement officers were, at most, negligent in allowing the homeowner to discard the bed and bedding. Iron Eyes, 367 F.3d at 786-87. However, that conduct did not give rise to a due process violation.

Similar to Iron Eyes, the facts of this case show that Special Agent O'Connell acted in good faith when he informed detection staff in Fort Yates that there was no need to retain Ayutapi's clothing. Ayutapi admitted he was at the scene of the crime, his hands and clothing had blood on them, and he could not explain what he was doing the night and morning when Loren Uses Arrow was stabbed because of his level of intoxication. Special Agent O'Connell stated that Ayutapi did not have any apparent injury that would have produced the blood found on his person and clothing. Special Agent O'Connell testified that he assumed that Ayutapi's clothing had Loren Uses Arrow's blood on it, but believed the clothing was not needed for evidence based on the strength of Red Bow's multiple incriminating admissions and the minimal amount of blood on the clothing, which indicated that only incidental contact had occurred.

It is clear from the record, and the evidence presented at the evidentiary hearing, that Special Agent O'Connell did not believe that Ayutapi's clothing would provide exculpatory evidence, but rather would confirm the obvious: that Loren Uses Arrow's blood was present on Ayutapi's clothing. It certainly would have been reasonable to retain Ayutapi's clothing for evidentiary purposes. As the Eighth Circuit recognized in Iron Eyes, it was arguably negligent to have failed to retain such evidence under the circumstances. However, it is well-established that mere negligence does not equate with bad faith and a resulting due process violation. The Court finds that the Defendant has failed to sustain the burden of proof and has not shown that law enforcement officers acted in bad faith when they failed to retain Ayutapi's clothing. Accordingly, no due process violation has been shown and Red Bow's motion to dismiss is denied.

### III. CONCLUSION

The Court has carefully considered the entire record, relevant case law, and the evidence introduced at the hearing on March 26, 2012. The Court **DENIES** Red Bow's motion to dismiss (Docket No. 45).

**IT IS SO ORDERED**.

Dated this 2nd day of April, 2012.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court